UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| 1st UNITED TELECOM, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE NO. 3:10-CV-02255-B |
| | § | |
| MCI COMMUNICATIONS SERVICES, | § | |
| INC., d/b/a VERIZON BUSINESS | § | |
| NETWORK SERVICES, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM OF DEFENDANT VERIZON BUSINESS
IN SUPPORT OF ITS MOTION TO COMPEL AND REQUEST FOR SANCTIONS**

Scott H. Angstreich (*pro hac vice*)
D.C. Bar No.: 498539
Michael J. Fischer (*pro hac vice*)
D.C. Bar No.: 417085
KELLOGG, HUBER, HANSEN, TODD,
  EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
(202) 326-7999 (fax)
mfischer@khhte.com

Stanley D. Broome
Texas SBN: 24029457
Louisiana SBN: 24979
BROOME LAW FIRM, PLLC
105 Decker Court, Suite 850
Irving, Texas 75062
(214) 574-7500 (office)
(214) 574-7501 (fax)

*Attorneys for Defendant Verizon Business*

September 30, 2011

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................................... ii

INDEX OF EXHIBITS ............................................................................................................ iii

BACKGROUND ........................................................................................................................ 1

    A.    1st United's Access Charges ............................................................................... 2

    B.    Verizon Business's Discovery Requests ............................................................ 4

DISCUSSION ............................................................................................................................. 6

I.    1st UNITED SHOULD BE COMPELLED TO ANSWER INTERROGATORIES AND PRODUCE DOCUMENTS RELATING TO THE CALL CENTERS THAT GENERATED THE TRAFFIC AT ISSUE IN THIS CASE ........................................................................................................ 6

II.    1st UNITED SHOULD BE COMPELLED TO PRODUCE THE INVOICES AND CALL DETAIL RECORDS FOR WHICH IT SEEKS PAYMENT ...................................................................................................... 10

III.    1st UNITED SHOULD BE COMPELLED TO RESPOND TO VERIZON BUSINESS'S OTHER DISCOVERY REQUESTS ............................................... 11

    A.    1st United's Officers, Directors, and Employees (Interrogatory 2), Articles of Incorporation and Bylaws (RFP 7), and Financial Statements (RFP 8) ............................................................................................. 11

    B.    1st United's Locations, Facilities, and Equipment (Interrogatory 5) .................. 12

    C.    Communications (RFPs 6 and 16) ................................................................... 12

IV.    1st UNITED SHOULD BE SANCTIONED FOR ITS FAILURE TO RESPOND TO VERIZON BUSINESS'S DISCOVERY REQUEST AND ITS REFUSAL TO MEET AND CONFER WITH VERIZON BUSINESS ................. 13

CONCLUSION ........................................................................................................................ 14

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Barber v. Dolgencorp of Texas, Inc.*, No. 4:09-CV-60, 2010 WL 1375193
 (E.D. Tex. Mar. 31, 2010)..................................................................................................6

*York v. Tropic Air, Ltd.*, Civ. V-10-55, 2011 WL 1654418 (S.D. Tex. Apr. 28, 2011).......................6


**STATUTES AND RULES**

Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227 *et seq.*................................................3

 § 227(b)(1)(A)(iii) ................................................................................................ 3, 4

Fed. R. Civ. P. 26(b)(1)..................................................................................................6

Fed. R. Civ. P. 37(a)(4)..................................................................................................6

Fed. R. Civ. P. 37(a)(5)(A)............................................................................................13

## INDEX OF EXHIBITS

| Exhibit No. | Description |
|---|---|
| A | Specific discovery requests for which Verizon Business seeks to compel responses |
| B | Defendant's first set of interrogatories, requests for the production of documents, and requests for admission (June 14, 2011) |
| C | 1st United's objections and responses (Aug. 29, 2011) |
| D | Declaration of Stanley D. Broome |
| E | Excerpts of 1st United's document production to Verizon Business (Sept. 9. 2011) (under seal) |
| F | Excerpts of 1st United's initial disclosures (Dec. 15, 2010) |
| G | Excerpts of Texas Access Service Price List of 1st United (Apr. 4, 2006) |
| H | Excerpts of Application for Certification of 1st United (May 25, 2004) |

MCI Communications Services, Inc., d/b/a Verizon Business Network Services ("Verizon Business"), respectfully submits this memorandum in support of its motion to compel. More than three months after Verizon Business first served discovery requests, plaintiff 1st United Telecom, Inc. ("1st United") has failed to produce a single document that Verizon Business did not already have in its possession or have ready access to.  In addition, 1st United has outright refused to produce whole categories of materials that go to the heart of this case – including, most notably, documents relating to the call centers that generated the telephone traffic for which 1st United demands payment.  Instead, 1st United has produced to Verizon Business hundreds of pages of documents that Verizon Business already had in its possession (such as publicly filed pleadings in a prior dispute between the parties), in a clear attempt to create the appearance of providing relevant discovery while in reality producing nothing at all. Furthermore, 1st United has simply refused to meet and confer with Verizon Business to discuss Verizon Business's discovery requests, despite repeated requests from Verizon Business that it do so.  Verizon Business's motion to compel should be granted, 1st United should be ordered to comply with its discovery obligations, and it should be sanctioned for flagrantly violating the discovery rules.

## BACKGROUND

Verizon Business is a telecommunications company that provides a variety of services, including long-distance and toll-free services, to corporate and other customers throughout the world.  Plaintiff 1st United was a competitive local exchange carrier ("CLEC") – that is, a provider of local telephone service that competes with the incumbent provider in a given geographic area.  *See* Verizon Business Answer & Counterclaim ¶ 76 (Doc. 24) (filed Apr. 11, 2011) (hereinafter "Answer").  During its existence, 1st United did not actually provide local telephone services itself, however; instead, it obtained such services entirely on a wholesale

basis from a separate Verizon entity – GTE Southwest Incorporated d/b/a Verizon Southwest ("Verizon Southwest") – and resold them to its customers without using any telecommunications equipment of its own.

    A.    **1st United's Access Charges**

This case centers on invoices 1st United submitted to Verizon Business for calls allegedly placed by 1st United customers to toll-free numbers used by Verizon Business's customers during the period April 2008 through June 2008. *See* Answer ¶ 79. Toll-free numbers (often referred to as an "8YY" number[1]) are so-called because they allow a person to make a long-distance call without paying the cost (or toll) for that call. Rather, the recipient of the 8YY call pays its long-distance carrier for that call, and the long-distance carrier is then billed by the local telephone company – in this case, 1st United – that serves the customer who dialed the call. *See id.* ¶ 76.

In 2008, auditors for Verizon Business observed a suspicious pattern of calling activity from telephone numbers assigned to 1st United. Before April 2008, 1st United had not sent an invoice to Verizon Business for 8YY calling activity since December 2006, when it charged Verizon Business only $3,009.94. *See* Answer ¶ 79. Then, in April 2008, 1st United demanded $94,993.00 in payment for 8YY calls made in a single month – an increase of more than 3,000% from the bill submitted 15 months earlier. *See id.* This bill was followed by invoices in May and June, each demanding more than $100,000 from Verizon Business.

Based on this dramatic increase in charges, Verizon Business conducted an audit of the calling activity associated with these invoices. *See id.* ¶ 80. That audit revealed that the calls in question were all dialed from approximately 100 phone numbers, were dialed continuously

---

[1] Originally, all toll-free numbers began with an "800" prefix; now, because prefixes such as 866, 877, and 888 are used, those numbers are often referred to generally as "8YY" numbers.

throughout the day, and were dialed to sequentially numbered 8YY numbers. Furthermore, Verizon Business discovered that, for a sample period, 99.98% of the calls in question had a duration of less than one minute and 98% had a connect time of 15 seconds or less. This pattern of activity is consistent with the use of a device called an "autodialer" in order to generate fraudulent calls to toll-free numbers, so that a local telephone company can bill charges – particularly the 8YY database charge – to the long-distance carrier serving the toll-free number.

Autodialers are, in effect, computers that are pre-programmed to dial specific numbers. Under certain circumstances, they can be used for legitimate purposes, such as to deliver pre-recorded political messages to regular phone numbers. Yet by programming an autodialer to call only toll-free numbers, as happened here, it is possible to generate fraudulent 8YY charges to bill to the long-distance carrier that serves the toll-free number. Under the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227 *et seq.*, this practice is illegal. *See* 47 U.S.C. § 227(b)(1)(A)(iii) (declaring it illegal to "to make any call . . . using any automated telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to . . . *any service for which the called party is charged for the call*") (emphasis added).

Based on its investigation, Verizon Business informed 1st United by letter that it would not pay the invoices in question due to the fraudulent and illegal nature of the calling activity. 1st United responded by denying the allegations, but failed to provide a meaningful explanation for the calling activity. Instead, 1st United claimed that the calls originated from "call centers in conjunction with seasonal calling campaigns," Exh. E at 1UNT000389 – a highly dubious claim, given that the calls in question were all dialed to 8YY numbers[2] and only

---

[2] Because 8YY numbers are typically operated by businesses, there is no logical reason why they would be targets of a "seasonal calling campaign," such as those associated with marketing efforts or political campaigns.

3

to 8YY numbers, and were of extremely short duration (99.98% of the calls lasted less than one minute during the test period). Verizon Business's investigation further revealed that several individuals had posted complaints on various websites about receiving calls from these specific numbers during which the caller seemed to hang up without speaking, supporting its conclusion that the pattern of activity was indicative of the fraudulent use of an autodialer.

After Verizon Business informed 1st United that it would not pay for these fraudulent calls, 1st United initiated an action before the Texas Public Utility Commission ("PUC") seeking the $421,333.77 it claimed it was owed by Verizon Business. *See* Memorandum in Support of Verizon Business's Motion For Partial Judgment on the Pleadings at 5 (Doc. 50) (filed Aug. 22, 2011). The PUC issued a preliminary order concluding that 1st United's complaint did not state a valid claim, but it did not preclude 1st United from filing an amended complaint. *See id.* 1st United, however, chose to seek dismissal of its complaint before the PUC issued a final ruling, and the matter was dismissed with both parties' consent. *See id.* 1st United then initiated an action in state court on October 1, 2010, seeking payment of $421,333.77 as well as other unspecified damages. Verizon Business removed the case to this Court and subsequently filed a counterclaim against 1st United. Verizon Business's counterclaim alleged that 1st United had violated § 227(b)(1)(A)(iii) through the use of autodialers, and sought statutory and other damages from 1st United.

B.  **Verizon Business's Discovery Requests**

On June 14, 2011, Verizon Business served 1st United with interrogatories, requests for the production of documents ("RFPs"), and requests for admission. *See* Exh. B. 1st United sought and obtained, with Verizon Business's consent, two extensions of the deadline by which it was required to respond, and, as a result, was given until August 26, 2011, to respond and produce documents. On August 29, 2011, Verizon Business received 1st United's objections

4

and responses by mail; however, no documents were included with the responses. *See* Exh. C.[3] Only two weeks later, on September 13, 2011, did 1st United produce documents. However, *every single one* of the 547 pages produced consisted of materials that Verizon Business or its affiliates already possessed or could easily obtain from public sources. For instance, 1st United produced to Verizon Business the 233-page application for approval of an interconnection agreement that Verizon Southwest (a local telephone company affiliated with Verizon Business) and 1st United had jointly submitted to the Texas PUC on November 5, 2007. 1st United also produced 172 pages of pleadings from the docket in the prior dispute between Verizon Business and 1st United before the PUC. The remaining material consisted of a separate contract with Verizon Southwest, various public filings with the PUC, and correspondence between the parties. As a result, more than three months after receiving Verizon Business's discovery requests, 1st United still has not produced a *single relevant document* that Verizon Business did not already possess or have easy access to.

Since receiving 1st United's responses, Verizon Business's counsel has contacted 1st United's counsel on several occasions in order to discuss Verizon Business's discovery requests. *See* Declaration of Stanley D. Broome (attached hereto as Exhibit D). 1st United's counsel has not responded to any of Verizon Business's requests for a meet-and-confer session, nor has it provided any additional material. *See id.* As a result, Verizon Business has no choice but to file a motion to compel.

---

[3] 1st United's discovery responses mistakenly state that they are being submitted by "Plaintiff Connect Insured Telecom, Inc." *See* Exh. C at 1. Connect Insured is a now-defunct CLEC owned by an individual affiliated with the former owner of 1st United. Connect Insured, represented by the same counsel as 1st United, has filed a nearly-identical action in this Court against various long-distance companies. *See Connect Insured Telephone, Inc. v. Qwest Long Distance, Inc., et al.*, No. 3:10-cv-01897-D-BD (N.D. Tex.). In that action, Qwest and the other long-distance carriers have defended on the ground that, like 1st United, Connect Insured used an autodialer to generate fraudulent revenues for 8YY calls.

## DISCUSSION

Under Federal Rule of Civil Procedure 37(a), any party may seek an order to compel if the opposing party fails to respond to legitimate discovery requests. For purposes of this rule, "an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond." Fed. R. Civ. P. 37(a)(4). Pursuant to this rule, a motion to compel may be sought "so long as [the] discovery is relevant and otherwise discoverable." *York v. Tropic Air, Ltd.*, Civ. V-10-55, 2011 WL 1654418, at *1 (S.D. Tex. Apr. 28, 2011). Under the federal rules, the meaning of "relevant" is broad. *E.g.*, *Barber v. Dolgencorp of Texas, Inc.*, No. 4:09-CV-60, 2010 WL 1375193, at *1 (E.D. Tex. Mar. 31, 2010). Pursuant to Rule 26, "[r]elevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1).

The discovery Verizon Business seeks is plainly relevant, and 1st United's excuses for not providing it are without justification.[4] 1st United should be compelled to respond.

I.  **1st UNITED SHOULD BE COMPELLED TO ANSWER INTERROGATORIES AND PRODUCE DOCUMENTS RELATING TO THE CALL CENTERS THAT GENERATED THE TRAFFIC AT ISSUE IN THIS CASE**

Throughout this litigation and the prior proceedings between the parties in front of the PUC, 1st United has claimed that the traffic at issue consisted of "legitimate call traffic from call centers" or "traffic from call centers in conjunction with seasonal calling campaigns." Plaintiff's First Amended Complaint ¶ 12 (Doc. 13) (filed Feb. 14, 2011); Exh. E at 1UNT000389. Despite these repeated claims, it has never identified the call centers that generated this traffic. Verizon Business therefore served several interrogatories and document requests seeking information about these alleged call centers, but 1st United refused to provide any information. For instance, Interrogatory No. 1 asked:

---

[4] Attached as Exhibit A is a list of the specific discovery requests to which Verizon Business seeks responses.

6

>   INTERROGATORY NO. 1:    On page 13 of 1st United's Complaint against Verizon Business Network Services d/b/a MCI, Docket No. 37671 filed with the Public Utility Commission of Texas on November 16, 2009 (attached as Exhibit "1"), 1st United asserted that "1st United originated most of the disputed traffic from call centers in conjunction with seasonal calling campaigns."
>   a.  Identify all of the call centers from which the disputed traffic originated, describe any services the call centers purchased from 1st United, describe any affiliation between 1st United and the call centers, and describe the nature of the seasonal calling campaigns.
>   b.  For each month beginning April 2008 through November 2008, identify the percentage of the disputed traffic that was originated by call centers.
>   c.  Identify all sources of disputed traffic other than the call centers identified above.

Exh. B at 9. 1st United refused to answer this interrogatory. *See* Exh. C at 8. It similarly refused to answer interrogatory 10, *see id.* at 11-12, which sought information about contracts and billing arrangements between 1st United and individuals or entities that operated call centers; interrogatories 11 and 12, *see id.* at 12-13, which requested information about call centers to which 1st United had assigned telephone numbers; interrogatory 13, *see id.* at 13-14, which requested information about payments from call centers, and interrogatory 17, *see id.* at 15-16, which asked about 1st United's relationship with entities that operate call centers.

In addition, Verizon Business served 1st United with several requests for the production of documents relating to the call centers that conducted the disputed calls. For instance, Verizon Business sought business plans and communications discussing business opportunities relating to call centers or the handling of toll-free calls, *see* RFP 12 (Exh. B at 18); 1st United refused to provide responsive documents, *see* Exh. C at 21. Verizon Business similarly requested all documents relating to the "seasonal calling campaigns" that 1st United alleged generated the disputed traffic, *see* RFP 15 (Exh. B at 19); 1st United refused to provide responsive documents, *see* Exh. C at 21. Finally, Verizon Business requested all documents relating to 1st United's contracts or billing arrangements with or payments made to or received from (directly or indirectly) persons or entities that operate call centers or offer call

7

center services.  *See* RFPs 9, 10 (Exh. B at 17, 18). 1st United responded that it had no responsive documents, *see* Exh. C at 19, 20, which is plainly inconsistent with its claim that the disputed traffic originated from call centers.[5]

There can be no serious dispute that the information Verizon Business seeks is relevant to this matter.  Verizon Business has refused to pay for the calls at issue on the ground that they were generated by autodialers as part of a scheme to generate fraudulent access charges. 1st United has repeatedly claimed that the calls were legitimate calling activity carried out by call centers "in connection with seasonal calling campaigns."  Exh. E at 1UNT000389.  Verizon Business is therefore entitled to information about the supposed call center themselves.  Yet 1st United still has refused to identify the customers that generated these calls, much less provide detailed information about the call centers themselves.

1st United's excuses for refusing to provide the requested information are without merit.  Nearly all of 1st United's objections were boilerplate – for instance, it claimed the interrogatories or requests were overly broad, sought discovery that was more readily obtainable from other sources, or that the benefit of the relevant discovery outweighs its benefits.  None of these assertions was true: Verizon Business sought specific information that is directly relevant to the claims and defenses in this matter that it could not obtain from other sources.

Some of 1st United's objections were even more frivolous.  For instance, its sole basis for refusing to provide documents relating to the "seasonal calling campaigns" it had alleged were responsible for the calls at issue was that Verizon Business had not attached the document in which 1st United itself claimed that the calls were generated by seasonal calling campaigns.

---

[5] 1st United also claimed that it had no documents relating to the use of autodialers to originate calls it handled, which is similarly implausible.  *See* RFP 5 (Exh. B at 3); Exh. C at 18.

8

*See* Exh. C at 21.  1st United also objected to an interrogatory requesting information about the seasonal calling campaigns on the same basis.  *See id.* at 8.  Yet the document at issue – a letter from 1st United to Verizon Business that was attached as an exhibit to 1st United's PUC filing – was prepared by 1st United itself, and Verizon Business both included the docket number and date of the PUC filing and quoted the relevant portion of the exhibit in its discovery requests. *See* Interrogatory No. 1 (Exh. B at 9).  In fact, 1st United *actually produced this document to Verizon Business* as part of its 547-page production of documents – not once, but three separate times.  *See* Exh. E at 1UNT000029, 1UNT000091, and 1UNT000389.[6]  1st United knew exactly what Verizon Business was seeking in these requests, but instead relied on the flimsiest of excuses to disregard its discovery obligations.

It is inexcusable that, more than three months after Verizon Business first served discovery requests, 1st United still has yet to provide a single piece of information relating to the calls for which it seeks payment in this litigation.  1st United should be compelled to provide the requested discovery immediately.

---

[6] Two copies of the letter are identical.  *See* Exh. E at 1UNT000029 and 1UNT000389.  The third copy of the letter is addressed to Verizon Business and begins with a discussion of the dispute between 1st United and Verizon Business.  However, the remainder of the letter -- while identical in virtually all respects to the other two letters – inexplicably refers to a billing dispute between "CIT" (presumably Connect Insured Telecom, *see supra* note 3) and AT&T.  *Compare* 1UNT000389 ("As Verizon may already be aware, 1st United originated most of the disputed traffic from call centers in conjunction with seasonal calling campaigns."), *with* 1UNT00091 ("As AT&T may already be aware, CIT originated most of the disputed traffic from call centers in conjunction with seasonal calling campaigns.").  This apparent error confirms that the individuals responsible for 1st United's autodialing scheme were carrying out the same scheme through Connected Insured Telecom and targeting different long-distance telephone companies.

Although the documents included in Exhibit E are all publicly available, 1st United designated them "Confidential" pursuant to the Confidentiality Order entered by the Court.  As a result, Verizon Business is filing this exhibit under seal.

II.     **1st UNITED SHOULD BE COMPELLED TO PRODUCE THE INVOICES AND CALL DETAIL RECORDS FOR WHICH IT SEEKS PAYMENT (RFPs 2 & 3)**

    1st United agreed to produce both the invoices and call detail records for the calls for which it seeks payments in this litigation. *See* RFPs 2, 3 (Exh. C at 17-18). But it has failed to do so, and, because it refuses to confer with Verizon Business, has given no indication of when it will produce these records. 1st United should be compelled to produce these records immediately.

    1st United billed Verizon Business for the calls that are reflected in these records, and it initiated this litigation to obtain payment for these calls. It must have had such records in its possession, or it could not have generated its bills. And it had an obligation to maintain these records to justify its claim that Verizon Business was obligated to pay the disputed charges – and it was further required to maintain them once it initiated litigation. In fact, 1st United has never denied that it has the records, nor has it ever suggested that there would be any significant burden associated with producing these records.

    Despite failing to produce these call detail records to Verizon Business, 1st United has demanded that Verizon Business go to the time and expense of generating and producing identical records. *See* 1st United Motion to Compel (Doc. 32) (filed May 19, 2011). This Court has ordered Verizon Business to produce call detail records for certain months. *See* Order on Motion to Compel (Doc. 61) (Sept. 20, 2011). Verizon Business, however, does not have call detail records for 1st United in a readily-accessible format. Rather, producing call detail records for 1st United would require Verizon Business to search a nationwide database of calls to identify those that were placed by customers of 1st United.

    To be clear, Verizon Business does not dispute that the calls at issue were made, and therefore does not contend that the call detail records are necessary or relevant to this litigation. 1st United, however, does contend that the records are necessary (despite never

10

articulating a reason as to *why* they are necessary) and sought an order compelling Verizon Business to generate and produce them.  1st United's reason for withholding the call detail records is clear:  by forcing Verizon Business to go through the time and expense of generating these records, it can substantially increase the cost to Verizon Business of litigating this case, and thus force an unwarranted settlement – even though 1st United undoubtedly has the records in its possession already.  1st United should be required to produce the records immediately.

III.     **1st UNITED SHOULD BE COMPELLED TO RESPOND TO VERIZON BUSINESS'S OTHER DISCOVERY REQUESTS**

   A.    **1st United's Officers, Directors, and Employees (Interrogatory 2), Articles of Incorporation and Bylaws (RFP 7), and Financial Statements (RFP 8)**

Verizon Business asked 1st United to identify its officers, board members, and employees, for the period January 1, 2008, to the present, and to describe each individual's responsibilities.  *See* Interrogatory No. 2 (Exh. B at 9).  In response, 1st United identified only one individual.  *See* Exh. C at 8 (identifying Mark Maxey as President).  1st United's dubious claim that it had only had one officer, board member, or employee during this period is contradicted by its initial disclosures in this case, *see* Plaintiff's Initial Disclosures at 1 (attached hereto as Exhibit F) (identifying Larry Matteson), as well as its filings with the PUC, *see, e.g.*, Texas Access Service Price List of 1st United (attached hereto as Exhibit G) (identifying Michael McBride as Executive V.P.); Application for Certification of 1st United (identifying Rhonda Greer as President) (attached hereto as Exhibit H).  1st United should be compelled to identify all of its officers, directors, and employees during the relevant period.

Verizon Business also requested that 1st United produce copies of its articles of incorporation and bylaws, as well as its financial statements and annual reports.  *See* RFPs 7, 8 (Exh. B at 17).  1st United agreed to produce incorporation and bylaws, but has failed to do so.

11

*See* Exh. C at 19.  It outright refused to produce financial statements and annual reports.  *See* Exh. C at 19.  This Court should compel 1st United to produce the requested documents.

        B.        **1st United's Locations, Facilities, and Equipment (Interrogatory 5)**

Verizon Business asked 1st United to identify "the ownership, physical location, dates of use, and where applicable, the type and model number, of all offices, locations (including sites of collocation), facilities, and equipment used or formerly used by 1st United."  Interrogatory No. 5 (Exh. B at 10).  In response, 1st United provided only the address of its office, and asserted that it "did not own or use telecommunication equipment that it owned."  Exh. C at 9.  The interrogatory, however, asked for information about all equipment and facilities *used* by 1st United, regardless of whether it was owned by 1st United.  This interrogatory plainly seeks relevant information, because a full answer will require 1st United to identify the calling equipment and facilities used to generate the fraudulent calls that are at the heart of 1st United's scheme – even if 1st United concealed its interest in such facilities and equipment.  1st United should therefore be required to provide a full answer to this interrogatory.

        C.        **Communications (RFPs 6 and 16)**

Verizon Business specifically asked for all communication "between Leo Wrobel and officers and employees of 1st United relating to (1) the use of auto dialing or Automatic Call Distribution equipment to originate calls to toll-free (or 8YY) numbers, (2) any business arrangements between 1st United or its affiliates and entities that operate call centers, and (3) the billing dispute that is the subject of 1st United's Complaint."  RFP 6 (Exh. B at 17).  Mr. Wrobel has served as 1st United's "consultant" and has submitted documents on 1st United's behalf to the PUC relating to this dispute (although he is not an attorney and cannot claim the protection of the attorney-client privilege).  In addition, Mr. Wrobel has professed to have knowledge regarding the source of the calls for which 1st United seeks payment in this

12

litigation.  Verizon Business also requested that 1st United produce all communication with any person relating to the charges at issue in this litigation.  *See* RFP 16 (Exh. B at 19).  In responding to both requests, 1st United agreed to produce such communications, *see* Exh. C at 18-19, 21-22, but, to date, it has not produced responsive documents.  It should be compelled to do so.

IV.  **1st UNITED SHOULD BE SANCTIONED FOR ITS FAILURE TO RESPOND TO VERIZON BUSINESS'S DISCOVERY REQUEST AND ITS REFUSAL TO MEET AND CONFER WITH VERIZON BUSINESS**

Finally, Verizon Business respectfully requests that this Court impose sanctions, to include the cost of bringing this motion, due to 1st United's egregious failure to comply with its discovery obligations.  Under Rule 37(a)(5)(A), a court must impose sanctions on a party if the party's conduct "necessitated" the filing of a successful motion to compel, unless certain exceptions are satisfied.  Fed. R. Civ. P. 37(a)(5)(A).  Here, 1st United has flouted its discovery obligations by refusing to produce materials that are plainly relevant to this litigation.  Furthermore, 1st United's actions were clearly not in good faith.  For instance, 1st United withheld all documents and information relating to the call centers it claims generated the calls that are at issue in this litigation because Verizon Business had not attached a specific document to its discovery requests – despite the fact that the requests could be easily understood without the document and that, regardless, 1st United had the document in its possession and, in fact, *produced the same document to Verizon Business* in response to its discovery requests.[7]

1st United's lack of good faith is underscored by its refusal to meet and confer.  Verizon Business first attempted to contact 1st United to schedule a meet and confer session

---

[7] Of course, if 1st United truly did not have the document, it could have contacted Verizon Business at any time during the 76 days it had to respond to the discovery requests and asked for a copy of it.  It did not do so.

13

immediately after receiving 1st United's discovery responses.  *See* Exh. D.  In a subsequent email requesting a meet-and-confer session, Verizon Business made clear the seriousness of its request, as it expressly informed 1st United that it believed that its objections were not made in good faith.  *See* Exh. D ¶7.  1st United did not respond to this message.  Verizon Business ultimately faxed 1st United a letter with "THIRD REQUEST FOR CONFERENCE" in bold type at the top, but 1st United did not respond.  *See id.* ¶¶ 9-10.  As a result, Verizon Business has been forced to file this motion to compel and occupy the Court's time with a dispute that the parties could potentially have resolved themselves (provided 1st United was willing to negotiate in good faith).  For this reason, sanctions against 1st United are warranted.

## CONCLUSION

For the reasons set forth above, Verizon Business respectfully requests that its motion to compel and its request for sanctions be granted.

Respectfully submitted,

s/Stan Broome

| | |
|---|---|
| Scott H. Angstreich (pro hac vice) | Stanley D. Broome |
| D.C. Bar No.: 498539 | Texas SBN: 24029457 |
| Michael J. Fischer (pro hac vice) | Louisiana SBN: 24979 |
| D.C. Bar No.: 417085 | BROOME LAW FIRM, PLLC |
| KELLOGG, HUBER, HANSEN, TODD, | 105 Decker Court, Suite 850 |
|     EVANS & FIGEL, P.L.L.C. | Irving, Texas  75062 |
| 1615 M Street, N.W., Suite 400 | (214) 574-7500 (office) |
| Washington, D.C. 20036 | (214) 574-7501 (fax) |
| (202) 326-7900 | |
| (202) 326-7999 (fax) | |
| mfischer@khhte.com | |

September 30, 2011

14

## CERTIFICATE OF CONFERENCE

      I hereby certify that, on numerous occasions, I attempted to contact Eric Fein, counsel for Plaintiff, to conduct a meet-and-confer session regarding the discovery requests that are the subject of this motion. Mr. Fein did not respond to my repeated requests to schedule a meeting. The details regarding my attempts to reach Mr. Fein are set forth more fully in Exhibit D.

    Eric D. Fein, P.C. & Associates
    Vickie S. Brandt
    3500 Oak Lawn Avenue, Suite 510
    Dallas, Texas 754219
    214-522-9599 (fax)

                                                                s/Stan Broome
                                                                **Stanley D. Broome**

## CERTIFICATE OF SERVICE

    I hereby certify that a true and correct copy of the foregoing document was served on the attorney for Plaintiff on this 30th day of September, 2011, by United States first-class mail, hand delivery, facsimile, or the Court's ECF system.

    Eric D. Fein, P.C. & Associates
    Vickie S. Brandt
    3500 Oak Lawn Avenue, Suite 510
    Dallas, Texas 754219
    214-522-9599 (fax)

                                            _s/Stan Broome_____
                                            **Stanley D. Broome**